UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD WAYNE ANDERSON,<br><br>Petitioner,<br><br>v.<br><br>SHAWN HATTON,<br><br>Respondent. | No. 2:18-cv-03148 TLN GGH P<br><br>FINDINGS & RECOMMENDATIONS |

*Introduction*

Petitioner, a state prisoner proceeding through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 1988 conviction and sentence. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302.

Pending before the court is respondent's motion to dismiss on the grounds that petitioner is barred by the one-year statute of limitations pursuant to 28 U.S.C. § 2244(d) and Ground Four fails to state a cognizable federal claim. ECF No. 7. Petitioner has filed an opposition, ECF No. 12, and respondent a reply, ECF No. 15. The motion to dismiss was heard on the court's regular law and motion calendar on May 30, 2019. ECF No. 19. James Dippery appeared on behalf of petitioner, and Supervising Deputy Attorney General Tami Krenzin and Deputy Attorney General Jamie Scheidegger appeared on behalf of respondent. After carefully reviewing the filings, the

1

court now issues the following findings and recommendations recommending that respondent's motion be granted.

*Procedural History*

On April 19, 1988, petitioner was convicted by a jury in Tehama County Superior Court of murder during the commission of a burglary (Count 1) and of burglary (Count 2). ECF No. 10-1 at 1. Petitioner was sentenced to a state prison term of 25 years to life on Count 1 and a term of six years for Count 2, which was stayed pursuant to Cal. Pen. Code § 654. Id. Petitioner appealed and the California Court of Appeal, Third Appellate District affirmed the judgment on November 20, 1989. ECF No. 10-2. Petitioner appealed to the California Supreme Court and the judgment was affirmed on March 15, 1990. ECF No. 10-3.

On September 30, 2015, petitioner proceeding through counsel, filed a petition for writ of habeas corpus in Tehama County Superior Court. ECF Nos. 10-4. On August 18, 2016, the Superior Court denied the petition after holding an evidentiary hearing. ECF No. 10-5. On August 25, 2016, petitioner proceeding through counsel, filed a motion for reconsideration that was denied on September 12, 2016. ECF Nos. 10-6, 10-7. On January 25, 2017, petitioner proceeding through counsel, filed a petition for writ of habeas corpus with the California Court of Appeal, Third Appellate District, and was denied on June 15, 2017. ECF Nos. 10-8, 10-9. Petitioner filed a petition for writ of habeas corpus with the California Supreme Court and was denied on November 01, 2017. ECF Nos. 10-10, 10-11.

Initially, petitioner filed an application with the Ninth Circuit for authorization to file a second or successive 28 U.S.C. § 2254 habeas corpus petition in the district court. The Ninth Circuit denied petitioner's application as unnecessary due to the initial habeas petition being dismissed for failure to exhaust and therefore did not require prior authorization to the filing of the succeeding petition in the district court. ECF No. 1. Subsequently, the case was transferred to the Eastern District of California and referred to the undersigned. Id. Petitioner's federal petition was deemed filed on February 5, 2018. Id.

////

////

*Factual Background*

Although the facts of a case are usually not germane in a motion to dismiss on a statute of limitations issue, the court will set them forth below to provide context to petitioner's claim for actual innocence serving as a gateway to the expiration of the statute of limitations. In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual background:

> Sometime during the late-night hours of March 16, 1987, or early morning hours of March 17, 1987, Mrs. Evelyn Minch; an elderly woman, was murdered in her home located at 635 Rio Street in Red Bluff, California. Mrs. Minch's body was discovered shortly after noon on March 17, 1987. She was found lying on her bed tied with four different kinds of electrical and telephone cords. Her hands were crossed in front of her and tied with two different types of cords, one of which was the telephone receiver cord which had been cut from the telephone on the nightstand next to her bed. The two cords around her hands led to a third cord which went through her legs and underneath her to a fourth cord secured to the bedpost or headboard.
>
> The bedroom had been completely ransacked and the other rooms were in general disarray, with food and garbage on the kitchen floor, objects strewn in the hallway and fur pieces lying on the floor of her sewing room.
>
> The police determined the home had been entered through a southwest bedroom window. An alley between Rio and Main Streets gave accessibility to the backyard of the residence. The screen door to the back porch, which the victim routinely locked in the evening was unlocked when Mrs. Minch's granddaughter, Maralyn, arrived around noon on March 17 to check on the status of her grandmother after a concerned neighbor called because Mrs. Minch's curtains remained closed and she was unable to reach her by telephone. Maralyn entered through the back door but she could not recall if it was locked. The police found the electric iron gate leading to the front of the house and the front door of the residence were securely locked and the slider safety chain in place.
>
> Dr. Boyd Stephens performed an autopsy on Mrs. Minch on March 18, 1987. Dr. Stephens determined there were five areas of injuries. She suffered five blunt trauma lethal crushing injuries to the skull, each delivered by a firm, rigid object, possibly a pipe. The victim also had been stabbed numerous times, the pathologist describing a cluster of 12 superficial stab wounds to the base of the skull and back of the neck and eight stab wounds on the right side of the neck, mostly superficial, the deepest one being one and three-quarter inches. The third area of stab wounds was a grouping of 38 sharp force injuries about the chest, some superficial, but two deep penetrating wounds which were lethal. The fifth area of trauma was

3

a series of patterns of bruising about the victim's chest. In the opinion of Dr. Stephens, all of the injuries contributed to her death. The best the physician could determine as to time of death was that the victim died within 24 hours before the body had been discovered at noon the previous day.

Richard Stephens and William Shorter placed defendant at the Iron Horse Bar[1] located at 648 N. Main Street in Red Bluff on the night of March 16, 1987, and early morning hours of March 17, 1987. Stephens testified he saw defendant standing outside the bar about 9:00 p.m. After 15 minutes, Stephens left the bar and again observed defendant, wearing blue jeans and a "maroonish-red" pullover sweater, outside the saloon. Shorter testified he saw both defendant and one John Borg the night of the 16th of March at the Iron Horse Bar about 2:00 a.m. Shorter said he recognized defendant because of his hairstyle and described defendant as wearing a maroon colored shirt. Defendant and Borg left the area in separate directions.

Alfred Stephens, father of Richard and a bartender at the bar, although not working the evening of March 16, observed Borg at the bar, first between 8:30 p.m. and 9:00 p.m. and again between midnight and 1:30 a.m.

About closing time, Borg scuffled with two men on the corner of Antelope and Main Streets. California Highway Patrol Officer Gary Lynn observed the altercation, and proceeded to the location to break up the fight. Officer Mark Stinson responded to a call concerning the scuffle at 2:13 a.m. He made a report and left the scene at 2:24 a.m. but drove by the bar again around 2:30 a.m. and observed Borg outside the bar.

Alfred Stephens left the area of the bar with Borg after the scuffle, walked around the corner to Pine Street where he separated from Borg, saying, "Good night," departing in his truck which was parked near the alley. Borg continued to walk towards the alley. Stephens drove east on Pine Street, turned right on Rio Street, but then thought he should give Borg a ride home because Borg's home was in the same direction as Stephens'. He turned around, drove back around the corner to Pine, checked both alleys, and drove around the general area but saw neither Borg nor anyone else on the streets. Officer Stinson observed a person who matched the description of Borg around 4:00 a.m. on March 17, 1987, walking on Antelope street, approximately two-tenths of a mile from the Minch residence.

A latent palm print lifted from the door casing of Mrs. Minch's bedroom was identified as belonging to John Borg. None of the other prints lifted from the house matched defendant.

Several items were identified as missing from the victim's home, including her purse, an Austrian gold coin, a rose gold-colored bracelet, a ring set and a yellow-gold rhinestone ring, crescent shaped and hollowed out with approximately 50 small diamonds.

---

[1] [Fn.1 in original excerpt] Defendant notes "[t]he Iron Horse Bar is approximately one-half block from the Minch home." The cite to the page of the transcript however does not corroborate this fact.

4

On August 8, 1987, about four months after the killing, defendant's cousin Michael Warden was arrested by Red Bluff police for public intoxication and providing false information to a police officer. He informed the police he had information about the Minch homicide which had been troubling him. Warden's interview by Detective Mack McCall resulted in a six-page typed report prepared by McCall detailing the information provided to him by Warden of defendant's statements to his cousin of his involvement in the homicide.

Warden had given his cousin a ride to his house on Main street on the evening of March 16, 1987, around 11:30 p.m. from a food and deli store on Antelope Street. He next saw defendant a few days later at Warden's house. Warden asked defendant if he had heard about the Minch murder to which defendant responded affirmatively and Warden reminded defendant that Warden had picked him up in the area that night. About three or four weeks later, Warden and defendant were driving around and defendant mentioned he knew some people that were involved in the homicide. He told Warden that these people had planned to "rob the house" and that he had some jewelry from the house. Warden did not believe defendant until he showed Warden a gold chain and a diamond ring, oval shaped, with several tiny diamonds in it.

In mid-July, Warden was again riding with defendant when defendant described what happened the night of the murder. Defendant said two "guys", "John and Steve" went through the back from the alley and into the Minch residence. Defendant was to stand "lookout" by the Cinderella Motel, located at the intersection of Rio and Antelope Streets.[2] Defendant thought his confederates were taking too long, so he went to the front door. Defendant then told Warden he stood in the bedroom doorway and witnessed the other two men trying to tie the victim's hands behind her back. They were unsuccessful so they turned her over on her back and tied her hands crossways in front of her, which defendant demonstrated to Warden by crossing his hands at his wrists. Mrs. Minch was screaming, telling them to take anything they wanted but to leave her alone. Defendant told Warden one man beat her with a pipe, that she was tied with rope or wire, and that she was stabbed 32 or 36 times. Defendant explained they had intended to rob the house, not expecting anyone to be at the residence. However, when they found Mrs. Minch at home, they had to kill her, "so she wouldn't say nothing."

On August 10, 1987, Detective McCall set up a meeting between defendant and Lieutenant Sisneros for August 12, 1987, to discuss the homicide. Defendant acknowledged he knew McCall had been talking to his cousin Mike.

---

[2] [Fn.2 in original excerpt] The Attorney General's brief describes the Minch house as "30 yards north of the intersection of Rio Street and Antelope Boulevard, where the Cinderella Motel was located." This distance, however, is not corroborated by the testimony on the page cited. The defendant notes the Cinderella Motel was nearby the Minch home. This fact is also not specifically corroborate by the testimony.

5

On August 12, 1987, at approximately 3:00 p.m., defendant appeared at the Red Bluff Police Department and met with Lieutenant Sisneros and Detective McCall. Sisneros testified he explained to defendant upon his arrival that the purpose of the meeting was to have defendant tell them of his involvement in the homicide.

The lieutenant proceeded to tell defendant they had information that defendant was involved in the homicide and let him know that the District Attorney's office was willing to grant him immunity in return for a complete and truthful statement and testimony regarding his involvement in the homicide. Defendant sought clarification but did not specifically respond to the immunity offer. He asked, "What's this really mean? How do I know you guys aren't going to screw me? You know me, McCall." McCall told defendant he thought defendant was responsible for the homicide and that Sisneros was giving him an opportunity to avoid being held responsible. Defendant repeatedly denied any involvement or responsibility, and expressed disbelief at the officers' contention that he was involved in the homicide.

After the initial discussion, approximately ten minutes into the interview, Sisneros read defendant his <u>Miranda</u> rights, to which defendant responded he understood. After the police officers asked defendant if he was willing to talk, defendant stated that if he talked to them it would be like putting a .38 to his head. During the two and a half hour interview, he neither told the officers he did not want to talk to them nor that he wanted a lawyer.

After he was read his <u>Miranda</u> rights, defendant would not comment as to whether he would accept the offer of immunity. He claimed all the police had was what Robin had said.³ McCall believed defendant was not being realistic about what the police knew about the case. Approximately 15 minutes had elapsed after defendant had received his <u>Miranda</u> rights, when McCall asked defendant if he would be willing to read and discuss the typed report he had made of Warden's statement, telling the defendant, "You can cut it off whenever you want." Defendant did not specifically ask for immunity prior to reading the statement. During the ten to twelve minutes it took defendant to read the six-page statement, he said nothing. After he finished reading the report, defendant stated, "Mike really did it, didn't he?" McCall said Mike told the truth, to which defendant responded that "Mike was a snitch and that's why Mike had to leave Covelo."

Several minutes passed and then defendant said, "You've really got me but you don't have Borg", claiming that all the police had was a partial print of John Borg's, found outside the house. Sisneros corrected this misimpression, explaining that the police had an identifiable palm print in the house. Defendant's statements exhibited a "flippant" attitude, according to McCall. Defendant "was not answering as to whether he would . . . completely commit himself to

---

³ [Fn. 3 in original excerpt] The only record indication of who Robin may have been is as a result of pretrial proceedings in which it was revealed that a Shasta County jail inmate named Robin Ray provided unverified information regarding the homicide.

6

the truth and accept the immunity we were willing to offer him."

The conversation became progressively more sober according to McCall, defendant claiming none of Warden's statement was true; that Mike had it all wrong. Sisneros then asked defendant what was true about the statement. Defendant agreed that Warden had picked him up by the food and liquor store and given him a ride to his residence at 1337 Grant street.[4] Other than this one question, neither Sisneros nor McCall asked defendant any direct questions concerning the Minch homicide or about John Borg and his involvement in the crime. McCall stated the officers' intent was not to ask defendant any questions until defendant accepted the immunity offer.

At approximately 4:45 p.m. or 5:00 p.m. defendant and the two officers signed an immunity agreement.[5] For approximately 20 minutes prior to the signing of the agreement the three men discussed the proposed agreement. Defendant stated he would now be willing to enter into an immunity agreement but wanted a clarification of what he felt he needed to be able to do so. Defendant expressed concerns about whether he would have to serve any jail time and about possible visitation rights with his daughter. It was again explained to defendant that in exchange for immunity from prosecution he would have to provide a true and complete statement and later would have to testify concerning his participation in the burglary/homicide against all other co-participants. At the in limine motion, McCall testified defendant was concerned at this point that the police "weren't just trying to screw him, that he would really be free . . . for his cooperation." McCall also explained that defendant's questions about immunity were "the most mature thing he did."

After defendant signed the agreement, Sisneros turned on the tape recorder to record his statement. There was "just silence on the tape." Defendant then said he could not remember and told Sisneros to turn off the tape. After the tape recorder was turned off, defendant said he was at George Brown's on the night of March 16, had stayed there all night and had accompanied Mr. Brown to court the following morning. Defendant had claimed prior to that that he was "really drunk that night" and had stayed at Grant street, the address where

---

[4] [Fn. 4 in original excerpt] Grant Street and Main Street are the same streets, Grant being the name for the Old Main Street.

[5] [Fn. 5 in original excerpt] The agreement was introduced as evidence at trial as People's Exhibit No. 49. It provided as follows: "I Richard Wayne ANDERSON DOB 2/23/62 have had explained to me that I would be granted complete immunity from prosecution in the homicide of Evelyn MINCH. In exchange for that immunity I must provide a complete statement of my involvement in the homicide of Evelyn Minch and the identity and complete explanation of the activities [sic] of all other suspects. I understand that this statement has to be complete and truthful. I also understand that I will need to testify at the direction of the District Attorney as a further condition of that immunity. [¶] I was also promised that witness protection money for relocation prior to testifying will be provided for me. I was also promised that the Red Bluff Police Dept. will make every effort to arrange visitation for me with my daughter, Maria Carol SIMON/ANDERSON in Middletown, Ca. Det. Mc CALL and Lt. SISNEROS also agree to produce all paperwork involving visitation that explains their efforts to provide that meeting with my child. [¶] I have read and understand the above and accept these conditions of immunity."

7

> the officer knew him to have a residence. Sisneros discontinued the interview because defendant was uncooperative and evasive and it was "obvious" defendant did not intend to disclose his involvement in the homicide.
>
> The defense consisted primarily of discrediting Warden's testimony and attempting to prove that appellant was no where near the murder scene when it occurred. The defense brought out several inconsistencies, the foremost one being Warden's statement that appellant had told him that he had entered the victim's home through the front door. Emma Rhoades, who stayed at Mr. Brown's residence the night of the murder, testified she got up in the middle of the night to go to the bathroom and defendant was asleep on the mattress on the bedroom floor.

ECF No. 10-2 at 2-12.

*Motion to Dismiss*

Respondent initially moves to dismiss the instant federal petition claiming it was filed beyond the one-year statute of limitations pursuant to 28 U.S.C. § 2244(d). Petitioner argues that he meets the actual innocence gateway to the Anti-Terrorism and Effective Death Penalty Act statute of limitations, and Ground Three must be allowed to proceed to a merits analysis.

Respondent also moves to dismiss Ground Four of the Petition as it alleges that deficiencies in the state court habeas fact finding process, i.e., a lack of procedural due process in collateral post-conviction review, is not a substantive claim at all in federal habeas. Respondent is undoubtedly correct if the substantive claim is solely one for procedural due process. Petitioner has supplied no established Supreme Court authority that deficiencies in collateral, post-conviction, state trial court procedures are a "claim" in federal habeas corpus.

Fairly read, the petition is asserting a merits claim of actual innocence, and secondly, that petitioner was not given a fair shake in the state courts during state habeas proceedings. The latter assertion (Ground Four), arising much later than the time of conviction and appeal, is one that might come into play in determining the need for an evidentiary hearing in federal court, if this court were to reach the substantive actual innocence merits . However, Ground Four should be summarily dismissed insofar as it is posited as a claim, and it will not be discussed in the statute of limitations analysis.

////

*Statute of Limitations*

On April 24, 1986, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"). AEDPA establishes a one-year statute of limitations for filing a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). 28 U.S.C. §2244(d)(1) provides four alternate trigger dates for commencement of the limitations period:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;
>
> (D) or the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

In the instant action, petitioner's direct appeals in state court became final before the enactment of AEDPA in 1990. "For state prisoners, [] whose convictions became final prior to AEDPA's enactment, AEDPA's one-year statute of limitations began to run on April 25, 1996, the day after AEDPA was enacted." Malcom v. Payne, 281 F.3d 951, 955 (9th Cir. 2002) (citing Patterson v. Steward, 251 F.3d 1243 (9th Cir. 2001). Here, petitioner had one year from the enactment of AEDPA, or until April 24, 1997, to file a habeas petition, notwithstanding statutory or equitable tolling. Accordingly, petitioner's habeas petition filed over twenty years later on February 5, 2018, is statutorily untimely with respect to Grounds One to Three.[6]

---

[6] Ground Four has a different AEDPA statutory accrual date than Grounds One to Three. That is, the facts underlying that asserted claim did not arise until fairly recently, i.e., the state habeas

9

*Actual Innocence (Ground Three)*

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar…[or] expiration of the statute of limitations." McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) (citations omitted). To present a credible claim of actual innocence, "such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). "'[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggen, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329; see House v. Bell, 547 U.S. 518, 538 (2006)). "Actual innocence means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623 (1998). The actual innocence exception applies to a "narrow class of cases implicating a fundamental miscarriage of justice." Lee v. Lambert, 653 F.3d 929, 937 (9th Cir. 2011). To invoke the miscarriage of justice exception to AEDPA's statute of limitations, a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. McQuiggin, 569 U.S. at 286.

A petitioner asserting a convincing actual innocence claim need not also prove diligence in order to excuse timeliness. McQuiggin, 569 U.S. at 398-99. However, timing "is a factor bearing on the reliability of the evidence purporting to show actual innocence. Id. at 386-87 (citing Schlup, 513 U.S. at 332) (internal quotations omitted). Accordingly, "unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." Id. at 399.

////

////

---

actual innocence hearing, and its culmination, did not take place until 2016. However, because Ground Four states no cognizable claim, it is not necessary to perform a limitations analysis on this claim.

*Non-Actual Innocence Grounds (One, Two and Four)*

To the extent that these grounds, involving a polygraph test and falsity of evidence, are construed as claims independent of the actual innocence claim, petitioner's counsel conceded at hearing that such would be untimely. Nothing has been presented in the way of statutory or equitable tolling which could make these claims timely with respect to petitioner's 1988 conviction. To the extent that the polygraph test could be considered evidence of actual innocence, it will be discussed below.

As set forth above, Ground Four is not a substantive claim in federal habeas corpus, but rather an assertion which might come into play should the actual innocence issue ever reach the merits stage. It has been recommended dismissed on that basis and does not pertain to the actual innocence statute of limitations issue.

*Threshold Procedural Issue-Standard of Review*

The undersigned is unaware of any cases discussing the standard of review for determining whether the actual innocence gateway has been established, i.e., AEDPA deference or *de novo*. Perhaps the paucity of cases indicates that the procedural context of this case is rare: the state court held an evidentiary hearing on the merits of the actual innocence claim, but the issue in federal court is, at least initially, application of the AEDPA limitations statute. Respondent assumes that AEDPA deference applies and argues that the undersigned must judge the actual innocence gateway facts under a rubric of state court unreasonableness as to the factual findings. See 28 U.S.C. 2254 §§ (d)(2); (e)(1).

The undersigned will apply a de novo review based on common sense. The AEDPA statute of limitations issue is a federal issue; in determining the timeliness of a claim posited in federal habeas, the court is not directly assessing a state substantive ruling to which AEDPA deference is owed even though the factual context presenting the federal limitations issue is one arising out of the merits of a substantive claim.

Moreover, respondent was not able to counter at hearing the utter futility of applying AEDPA deference in the limitations determination context. That is, if AEDPA deference is to be applied here, what would be left to be decided in making a determination on the merits later on?

11

Answer- nothing. Why then not simply proceed to the merits instead of addressing the present determination as a limitations issue? In other words, if the court were to deny respondent's motion, would that be the end of the case? After all, AEDPA deference, according to respondent, would have been applied at the limitations decision stage; what would respondent show in addition at hearing on the merits? Answer- nothing. Therefore, the undersigned will apply *a de novo* standard of review in this limitations context to the facts as set forth in support of actual innocence. If this case were to reach the merits during this proceeding, AEDPA deference would, of course, be applied.

*Petitioner Has Not Demonstrated Actual Innocence; the Prerequisite for the McQuiggin Gateway*

In Grounds One through Three, petitioner presents his own declaration, declarations from John L. Borg ("Borg") and Ellen J. Egger ("Egger"), as well as petitioner's polygraph test results conducted prior to his jury trial, as newly discovered evidence sufficient to support his claims of actual innocence. The undersigned will review the evidence individually and then collectively.

Petitioner presents his own declaration dated July 21, 2015 as part of his actual innocence claim. ECF No. 2 at 34-35 (Exhibit 2). Petitioner declares that he has continued to maintain his innocence and had "no part in, or responsibility for, the murder of Mrs. Minch." Id. at ¶3. Petitioner states he "did not know John Borg" and only "met him occasionally while out at bars or parties in the Red Bluff area" and "may have also have briefly worked on a labor crew with him a year or more prior to this crime." Id. at ¶4. Petitioner contests that although the prosecution at trial presented a witness placing petitioner with Borg drinking at a bar the night of the murder and burglary, petitioner states he "did not go to and was not present at any Red Bluff bar that night" and "did not see Mr. Borg at a bar, or anywhere else that evening." Id. at ¶5. Petitioner lastly declares that during his preliminary hearing he had testified incorrectly that "on the night of the crime" he was at his "own home in Red Bluff" when in actuality he recalls, that he had, "in fact, stayed that night and had been staying in the days before and after the crime at George Brown's house in Red Bluff." Id. at ¶6. Petitioner states that he did not testify at trial based on this inconsistent statement from his preliminary hearing. Id.

12

Petitioner's self-serving declaration fails to constitute new reliable evidence for his claims of actual innocence. Schlup, 513 U.S. at 324. "A self-serving declaration is not the kind of evidence that meets the Schulp 'more than likely that no reasonable jury would have convicted him' standard." Jackson v. Beard, No. 12-CV-2479-BEN (BGS), 2014 WL 2657536, at *7 (S.D. Cal. June 12, 2014) (citing Herrera v. Collins, 506 U.S. 390, 423 (1993); Baran v. Hill, No. CIV. 07-1411-CL, 2010 WL 466153, at *7 (D. Or. Feb. 9, 2010); McArdle v. Sniff, No. EDCV 08-552 PSG (JC), 2009 WL 1097324, at *5 (C.D. Cal. Apr. 20, 2009)).

Petitioner also presents his co-defendant, Borg's, declaration dated January 29, 2015 as newly discovered evidence for his actual innocence claim. ECF No. 2 at 31-32 (Exhibit 1). In the declaration, Borg declares his sole responsibility in the murder of Ms. Minch and further declares that petitioner was not with him during the time he committed the murder and burglary of the victim. Id. at ¶3. Borg declares that he did not know petitioner at the time of the crimes and that he knew petitioner only "causual[ly]." Id. at ¶4. Borg contests that although the prosecution at trial had a witness testify that he had seen the petitioner that night with Borg drinking together at a bar in Red Bluff, Borg did not "recall seeing [petitioner] that night." Id. at ¶5. Borg stated that he committed the crime when he "was drunk and high on speed." Id. at ¶6. Borg also declares that he "regret[s]" not having the "courage to come forward earlier on behalf of [petitioner]." Id. at ¶8.

However, Borg's declaration fails to establish that no reasonable juror would have convicted petitioner in light of the new evidence. Borg's testimony that petitioner was not present or involved in the burglary and murder merely conflicts with the evidence presented at trial that petitioner was at the scene of the crime. Although petitioner asserts that this evidence proves his innocence, the declaration does not with certainty absolve petitioner from his participation in the crimes. Afterall, Borg declares that he did not "*recall* seeing [petitioner] that night" and that he "was drunk and high on speed" when he committed the crimes. See ECF No. 2 at ¶¶5-6 (emphasis added). Moreover, Borg's declaration fails to discredit the following evidence presented to the jury at trial: two eyewitness accounts placing petitioner and Borg at the Iron Horse Bar together on the night of the incident; Warden's testimony about petitioner's description

13

of what happened the night of the burglary and the murder and being shown jewelry from the crime scene; and petitioner's own incriminating statements to the police. Accordingly, reasonable jurors could have found petitioner guilty even if they were presented with Borg's obscure testimony.

Petitioner also submits Egger's declaration (Borg's previous counsel) dated August 25, 2016 as evidence in support of his actual innocence claim. ECF No. 2 at 37-41 (Exhibit 3). Egger declares that she has received at least "200 letters from Mr. Borg" over the "26 years" she has known him and that "through his letters" she has "gotten to known him very well, and perhaps better than anyone." Id. at ¶4. Eggers declares that Borg had maintained his innocence up until "approximately five or six years ago (around 2010-2011), without any prompting or recent discussion of the subject, John suddenly revealed to me that he was actually guilty of the murder of Ms. Minch." Id. at ¶¶3, 5. Eggers states that Borg "said nothing at all about the murder itself, nor did [she] ask about it. His focus was simply on the fact of his guilt." Id. at 5. Egger further declares that "this past February [2016]" when Borg had written about petitioner, Egger's "had no independent memory that [petitioner] had even been convicted of Mrs. Minch's murder" and "had absolutely no memory about the existence or non-existence of co-defendants" based on the passage of time. Id. at ¶6. Egger declares that petitioner was mentioned to her for the first time in February 2016 when Borg wrote Egger a letter telling her that he had been visited by the district attorney to ask about petitioner. Id. at ¶ 8. Borg's letter stated that he had acted alone, and that petitioner had nothing to do with the crime. Id. Egger opines that Borg's testimony at the evidentiary hearing in the trial court was "truthful" and that his failure to bring this issue earlier is "consistent with his chronic drug and alcohol addiction, his clear cognitive impairments, his low IQ and low self-esteem, his many years of being "locked down while at High Desert State Prison, and the fact that he sees himself as completely separated and isolated from the rest of the world outside of prison." Id. at ¶11; see also Id. at ¶13. Egger explains that Borg "did not do anything to help Mr. Anderson before this is that, up until very recently, no one had ever asked him about Mr. Anderson." Id. at ¶12. Lastly, Egger believes Borg to be truthful due to his "deep Christian faith" and "conscience to finally come forward and speak the truth

14

about" petitioner's innocence. Id. at ¶15. Here, petitioner presents a declaration from a third party with no direct evidence to petitioner's actual innocence. This evidence fails to constitute as new reliable evidence for his claims of actual innocence. Egger's testimony merely provides assertions based on *her belief* that Borg is testifying truthfully about the crimes being committed only by him. Accordingly, reasonable jurors could have found petitioner guilty even if they heard Egger's testimony.

Lastly, petitioner presents polygraph evidence of his credibility, conducted prior to his jury trial, as sufficiently reliable new evidence to establish his actual innocence. See ECF No. 2 at 17-19. Generally, polygraph tests have generally been inadmissible and found to be unreliable evidence. See United States v. Scheffer, 523 U.S. 303 (1988) (There is no consensus among jurisdictions that polygraph evidence is reliable); see also United States v. Cordoba, 104 F.3d 225, 228 (9th Cir.1997) (allowing admission of such polygraph evidence but noting that its "inherent problematic nature … remains"). However, even if the jury trial were to be presented with petitioner's polygraph results, the undersigned cannot find that it is more likely than not that no reasonable juror would find petitioner guilty in light of the polygraph evidence. Moreover, petitioner's polygraph evidence is evidence that was available *prior* to the jury trial in 1987. Timing "is a factor bearing on the reliability of the evidence purporting to show actual innocence. McQuiggin, 569 U.S. at 386-87 (citing Schlup, 513 U.S. at 332) (internal quotations omitted). "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing." Id. at 385. Accordingly, the undersigned finds that petitioner has failed to proffer new and reliable evidence to establish his innocence.

The undersigned understands that evidence, when viewed individually, might not demonstrate an actual innocence exception, but when collectively assessed, would establish the actual innocence required. There is no doubt that all of the evidence presented now *might* have established a reasonable doubt in a juror's mind, but it cannot be said that the evidence was so clear and confirmatory of actual innocence that no reasonable juror could have found guilt beyond a reasonable doubt. In essence, the evidence presented now is not subject to objective confirmation. It is merely rather weak, general, latter day assertions of an alibi, or at least the

15

assertion that petitioner was not present at the scene of the crime. Borg's declaration unconvincingly flies in the face of the facts presented at trial that the murder was actually committed by two persons, not Borg alone. The lateness of all the evidence presented does detract from what credibility it might have had if the evidence had been presented earlier. It strains credulity to believe that petitioner's counsel, who must have been aware of petitioner's conviction, never alluded to this fact with Borg over decades despite the close, personal contact with Borg over those years.

The undersigned finds that petitioner has failed to provide sufficient new evidence in support of his claims of actual innocence. Accordingly, the actual innocence exception does not apply, and petitioner has failed to overcome the untimeliness of the present habeas petition.

*Conclusion*

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, foe the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1. Respondent's motion to dismiss, ECF No. 7, be granted;
2. The petition for a writ of habeas corpus be dismissed with prejudice; and
3. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the

////

////

16

objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 6, 2019

<u>/s/ Gregory G. Hollows</u>
UNITED STATES MAGISTRATE JUDGE